UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

DION JOHNSON,

Plaintiff,

v.

No. 2:24-cv-00426-JRS-MG

FRANK VANIHEL,
KEVIN GILMORE,
ASHLY MOSELEY,
RANDALL PERCELL,
KATHERINE FISCHER,
JACQUELYNNE PORTER,
MEEKS,
JACK HENDRIX,
MATTHEW LEOHR,

Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION TO STRIKE**

Plaintiff Dion Johnson has brought claims under the Eighth and Fourteenth Amendments for his placement in solitary confinement without meaningful review and for housing him in inhumane conditions. Defendants have moved for summary judgment. Dkt. [31]. Defendants also ask the Court to strike a document Mr. Johnson filed that has characteristics of both a motion for summary judgment and a summary judgment response. Dkt. [36]. For the reasons below the Court **denies** the motion to strike and **grants** the motion for summary judgment.

## I.
## Motion to Strike

Defendants ask the Court to strike Mr. Johnson's February 9, 2026, filing as both untimely and improper under the applicable federal and local rules. The filing is styled as a brief in support of Mr. Johnson's own motion requesting partial summary judgment, but no such underlying motion exists. Mr. Johnson neither cites evidence in support of his contentions made in the filing nor submits evidence to be considered alongside his filing. If the Court were to construe the filing as a motion for summary judgment, it would be properly denied for failure to comply with Southern District of Indiana Local Rule 56-1. So, instead, in the interest of justice, the Court construes the filing, dkt. [35], as Mr. Johnson's response to Defendants' motion for summary judgment. Construed as a response brief, the filing is not untimely. Also, construing the filing as a response does not prejudice Defendants because they included their reply in support of their motion for summary judgment inside their motion to strike.

Defendants also correctly identify that the filing does not comply with the federal and local rules concerning summary judgment briefs. Instead of striking the filing on this ground, however, the Court finds that it is in the interest of justice to rule on Defendants' motion on the merits presented in the summary judgment briefing submitted by the parties. *See Eubanks v. Norfolk S. Ry. Co.*, 875 F. Supp. 2d 893, 898 (N.D. Ind. 2012) ("While trial courts have the discretion to enforce rules strictly, they also can allow some leeway." (citing *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011)); S.D. Ind. L.R. 1-1(c) ("The court may, on its own motion or at the

request of a party, suspend or modify any rule in a particular case in the interest of justice.").

For these reasons, the Court **denies** the motion to strike. Dkt. [36].

## II.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to

properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## III.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. Defendants

At times relevant to the Plaintiff's Complaint, Defendant Jack Hendrix was the Executive Director for Classification at the Indiana Department of Correction's ("IDOC") Central Office. Dkt. 32-4 at 1. In this role, Defendant Hendrix would review recommendations from facilities that housed inmates currently on Department-Wide Restrictive Housing, Administrative ("DWRH-A") classification status and make recommendations to those individuals within IDOC who had the authority to reclassify them. *Id.* at 2-3.

At times relevant to the Plaintiff's Complaint, Defendant Frank Vanihel was the Warden of Wabash Valley Correctional Facility ("Wabash"). Dkt. 32-6 at 1. In this role, Defendant Vanihel did not have the authority to approve or initiate an interfacility transfer or removal of an individual from DWRH-A classification status. *Id.* at 2. All decisions regarding classification status for DWRH-A came from IDOC Central Office, following a recommendation from facility staff. *Id.* Once an individual

was released from DWRH-A, it was Warden Vanihel's decision if the individual would be allowed to re-enter general population based on a variety of factors including: security needs of the facility, the individual's known gang affiliations, and available bed space. *Id.*

At times relevant to the Plaintiff's Complaint, Defendant Kevin Gilmore was the Deputy Warden of Re-Entry at Wabash and during most of his time in that role served as the Warden's designee for all facility level classification decisions. Dkt. 32-7 at 1. Defendant Matthew Leohr was the Classification Supervisor at Wabash. *Id.*

In those respective roles, Defendant Leohr would prepare a response to grant or deny a classification appeal, based on policy and review of information, and Defendant Gilmore would receive that draft response and either sign it or send it back to Defendant Leohr. *Id.* at 2. For individuals on DWRH-A status, the only authority that Defendants Leohr and Gilmore had was to make a recommendation to IDOC Central Office regarding an individual's status. *Id.*

Defendants Meeks, Jacquelynne Porter-Marts, and Katherine Fischer were Unit Team Managers at Wabash, though Fischer was promoted to a Deputy Warden in January 2024. Dkt. 1 at 3; dkt. 32-8 at 1.

Unit Team Managers are not involved in classification appeals or 7-day or 30-day classification reviews aside from ensuring that those reviews were being completed by the caseworkers and providing context regarding progress on behavioral and educational programming. Dkt. 32-8 at 1.

At times relevant to the Plaintiff's Complaint, Defendants Randall Purcell and Ashly Moseley were caseworkers assigned to the Secured Confinement Unit ("SCU") at Wabash. Dkt. 32-5 at 1–2.

**B. Department-Wide Restrictive Housing, Administrative**

DWRH-A is for individuals undergoing an inter-facility transfer who are considered to represent threats to the secure operation of any IDOC facility that may ultimately house them. Dkt. 32-4 at 2–3. When determining whether DWRH-A is appropriate, the factors considered may include the individual's disciplinary history, physical and mental health concerns, and release date. *Id.* at 1–2. The final decisionmaker for DWRH-A status is the Deputy Commissioner of Operations, the Regional Director, or their designee. *Id.* at 2–3.

Weekly and monthly reviews of classification status are done at the individual IDOC facilities. *Id.* at 3. Upper-level appeals of the reviews go to the IDOC Central Office, as do recommendations by facilities that an individual's DWRH-A status be suspended. *Id.* at 4.

**C. Classification and Facility History**

Mr. Johnson was previously housed at New Castle Correctional Facility ("New Castle"), and while there he pled guilty to fighting at the facility and was placed into temporary restrictive housing. Dkt. 32-1 at 6; dkt. 32-3 at 10. Staff at New Castle notified the IDOC Central Office of Mr. Johnson's disciplinary history and recommended that Mr. Johnson be placed into DWRH-A status. Dkt. 32-3 at 10. In their letter recommending this, they noted that "[h]e is identified as a member of the Vice Lords security threat group with a high violence potential," had ten conduct

reports at his previous place of incarceration (eight of which were major), and was found to not be at a risk of decompensation if placed in an SCU. *Id.*

Mr. Johnson was approved for DWRH-A status on March 5, 2023. Dkt. 32-3 at 12. He was then transferred from New Castle to Wabash on April 25, 2023, with DWRH-A status. Dkt. No. 32-2 at 2. He was assigned to the SCU the entire time that he was incarcerated at Wabash, and his caseworkers there were Defendants Purcell and Moseley. Dkt. No. 32-5 at 1–2. Wabash's SCU caseworkers conduct classification reviews for individuals in the SCU. *Id.* at 1.

Classification reviews involve review of the individual's recent conduct, protective custody status, recent behavior towards IDOC staff, notes on the "offender management system," and occasional discussions with the individuals themselves. *Id.* at 2. For each subsequent review, this information is freshly examined to look for updates and ensure the information is current. *Id.*

Mr. Johnson received a classification review on April 26, 2023. Dkt. 32-3 at 9. He received another classification review (at his request) on June 27. *Id.* at 8. Defendant Purcell recommended that Mr. Johnson remain DWRH-A pending a status review. *Id.* On June 30, Mr. Johnson received a Behavior Modification Plan listing expectations for his behavior. Dkt. 32-3 at 13. On July 27, the Unit Team Manager, Deputy Warden, and Warden all chose not to recommend Mr. Johnson for reclassification, citing his recent conduct. *Id.* at 22.

The November 27, 2023, report from Mr. Johnson's classification hearing indicates that he was authorized to participate in educational programming available

to inmates within the SCU. *Id.* at 7. On December 1, Mr. Johnson was found guilty of refusing an order while he was within the SCU. *Id.* at 14.

On January 16, 2024, Defendant Purcell reviewed Mr. Johnson's classification status and did not recommend reclassification, noting a serious conduct violation that had occurred just over a year prior and opining that Mr. Johnson needed positive programming. *Id.* The supervisor of classification decided that Mr. Johnson would remain on DWRH-A. *Id.* at 6. Mr. Johnson received a new Behavior Modification Plan on January 29. *Id.* at 17.

On March 22, 2024, Defendant Moseley recommended Mr. Johnson be released from DWRH-A. *Id.* at 4. The Classification Committee approved the recommendation, indicating that Mr. Johnson would remain at DWRH-A status until he could be transferred to a facility of the appropriate security level. *Id.* The Supervisor of Classification approved the removal of Mr. Johnson's DWRH-A status on September 10. *Id.*

Because of Mr. Johnson's known affiliation with a prison gang active at Wabash, Warden Vanihel determined that his placement into general population while Mr. Johnson was still at Wabash could pose a security risk. Dkt. 32-6 at 2. Mr. Johnson was transferred out of Wabash on December 12, 2024. Dkt. 32-2 at 1.

## IV.
## Discussion

### A. Injury

Defendants argue that Mr. Johnson's complaint fails to state a claim because he did not allege that he was physically injured by the claims at issue in this lawsuit.

They claim that this omission is fatal to his entire lawsuit. This is not the law. The Prison Litigation Reform Act imposes a "limitation on recovery," stating that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury[.]" 42 U.S.C. § 1997e(e). The Seventh Circuit has continuously interpreted this provision to mean that "a prisoner cannot obtain *compensatory damages* without proving a physical injury." *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012) (emphasis added). Nevertheless, psychological harms alone may still give rise to an Eighth Amendment violation and provide a basis for a civil action for nominal and punitive damages as well as injunctive relief. *Id.* (citing *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)); *see also Byrd v. Hobart*, 761 F. App'x 621, 623 (7th Cir. 2019). Therefore, Mr. Johnson's claims can survive even without an allegation that he suffered a physical injury.

### B. Eighth Amendment – Conditions of Confinement

Mr. Johnson alleges inhumane conditions of confinement. While in restricted housing, he remained in his cell for 23 hours every day, and when he was allowed to leave for recreation, he was placed in a filthy recreation cage. He also alleges that he had problems with lighting, plumbing, heating, and ventilation while in the SCU.

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th

Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

Defendants argue that they should receive summary judgment in their favor on Mr. Johnson's conditions-of-confinement claim because they were not personally responsible for the alleged conditions. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). Indeed, "inaction following receipt of a complaint about someone else's conduct is [insufficient]." *Est. of Miller by Chassie v. Marberry*, 847 F.3d 425 428 (7th Cir. 2017). In considering personal responsibility, each defendant is considered independently. *Whitfield*, 76 F.4th at 706.

Mr. Johnson has designated no evidence to suggest that any of the defendants bore responsibility for the conditions that led him to file suit. He also provides no

argument or even bare assertion in his response that summary judgment in favor of Defendants should not issue on this claim. Because no evidence is identified to show that any Defendant is personally responsible for the conditions of confinement giving rise to the Eighth Amendment claim, the Court **grants** summary judgment in favor of Defendants as to this claim.

### C. Fourteenth Amendment – Administrative Segregation

Mr. Johnson alleges that he was not provided due process in regard to his long-term stay in restricted housing at Wabash. He asserts that he was not given timely and meaningful periodic reviews.

The Fourteenth Amendment to the Constitution does not create a due process liberty interest in avoiding transfer within a correctional facility or remaining in the general prison population. *See Wilkinson v. Austin*, 545 U.S. 209, 222 (2005); *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Instead, an inmate will be entitled to due process protections only when the more restrictive conditions pose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. After *Sandin*, inmates have no liberty interest in avoiding short-term transfer to segregation for administrative, protective, or investigative purposes, even when they are subjected to harsher conditions as a result. *See, e.g.*, *Townsend v. Fuchs*, 522 F.3d 765, 766 (7th Cir. 2008); *Lekas v. Briley*, 405 F.3d 602, 608-09 (7th Cir. 2005). However, placement in long-term segregation approaching a year or more can implicate a liberty interest, requiring further inquiry into whether the conditions of confinement impose an atypical, significant hardship. *See Marion v.*

*Columbia Corr. Inst.*, 559 F.3d 693, 698-99 (7th Cir. 2009) (determination of whether 240 days in segregation imposed an atypical, significant hardship could not be made at the pleading stage); *see also Atwater v. Nickels*, No. 21-2510, 2022 WL 1468698, at *1 (7th Cir. May 10, 2022) (citing *Marion*, 559 F.3d at 694-98) (same).

If placement in "administrative" segregation meets the "atypical and significant hardship" standard, "the Due Process Clause mandates that prison officials periodically review whether an inmate placed in administrative segregation continues to pose a threat." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983)). Although such periodic reviews need not be formal and adversarial, they must be sufficient to ensure that administrative segregation does not become a pretext for indefinite confinement. *Id.* The sufficiency of periodic reviews is evaluated by considering "(1) the private interest (that is, [the inmate's] interest) affected by a governmental decision, (2) the governmental interests at stake, and (3) 'the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Although submission of new evidence or a full hearing may not be necessary to meet the requirements of due process, "an actual review – i.e., one open to the possibility of a different outcome – certainly is." *Id.* at 528.

Due process does not require periodic reviews to be formal or adversarial. *Id.* at 472. Inmates are not ordinarily entitled to present evidence or statements. *Id.* at 477, n.9. Reviews may not be mere "meaningless, repetitive, and rote response[s]"

and must look to present and future conduct, as well as past. *Id*. at 527, 528 (internal quotations and citations omitted).

Similarly, due process does not require custodians to conduct their periodic reviews according to rigid timelines. "The periodic review need only be sufficiently frequent that administrative segregation does not become 'a pretext for indefinite confinement of an inmate.'" *Westerfer v. Neal*, ,682 F.3d 679, 686 (7th Cir. 2012) (quoting *Hewitt*, 459 U.S. at 477, n.9). Otherwise, the frequency of periodic reviews "is committed to the discretion of the prison officials." *Isby*, 856 F.3d at 525.

Defendants argue they are entitled to qualified immunity on this claim. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Once the defense of qualified immunity is raised, a defendant is entitled to dismissal unless a plaintiff comes forward with facts showing a constitutional violation and law showing his right was 'clearly established' at the time of the alleged violation." *Thomas v. Carmichael*, 164 F.4th 1058, 1067 (7th Cir. 2026) (quoting *Siddique v. Laliberte*, 972 F.3d 898, 902-03 (7th Cir. 2020)). "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017).

The "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v.*

*Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641). While "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quotation marks omitted)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

Here, Mr. Johnson's DWRH-A status was reviewed a few times during his time at Wabash's SCU. The evidence submitted indicates that relevant considerations

were taken into account—his recent conduct, his need for education, and his membership in a prison gang. Mr. Johnson offers no evidence that these reviews were not meaningful. The reviews, in fact, led to a recommendation for his release from DWRH-A status some 12 months after his designation to that status. *Isby*, 856 F.3d at 527-28. No evidence has been adduced to show that the recommendation of release was a fig leaf showing superficial progress toward release to the general population while allowing Mr. Johnson to languish in segregation. The recommendation progressed steadily, albeit with some delay due to a determination he first needed to be transferred to another institution based on security concerns of his gang affiliation at Wabash. He was afforded sufficient constitutional due process. Even so, Defendants argue that, to the extent Mr. Johnson was due more process than what they provided, they are protected by qualified immunity.

Mr. Johnson responds that it was clearly established that "prolonged segregation requires meaningful review," "boilerplate reviews violated due process," "[security threat group] status alone is insufficient," and "indefinite confinement without explanation is unconstitutional." Dkt. 35 at 4. The problem for Mr. Johnson, however, is that he has defined the issue at too high a level of generality. Mr. Johnson's periodic reviews were not plentiful, but it is unclear—and therefore not "clearly established"—how frequently those reviews needed to be the required "periodic" reviews. Mr. Johnson has not pointed to any legal authority suggesting that the reviews had to occur more frequently than they did. He has also presented no evidence that the reviews he received were not meaningful and instead were simply

boilerplate, and Defendants' evidence indicates that relevant information was considered for each of his reviews. He has not shown that his membership in the Vice Lords prison gang *alone* kept him in administrative segregation, nor has he presented evidence that he was given no explanation for his continued placement in administrative segregation.

Because Mr. Johnson has not shown the right to have received more meaningful or frequent periodic reviews to be clearly established, Defendants are protected by qualified immunity, and the Court **grants** summary judgment in their favor on the Fourteenth Amendment claim.

## V. Conclusion

Defendants' motion to strike, dkt. [36], is **denied**.

Defendants' motion for summary judgment, dkt. [31], is **granted**.

Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 8/24/2026

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

DION JOHNSON
275006
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All electronically registered counsel